**NORTH PENNSYLVANIA R. CO. v. ROTH-ENSIES, Collector of Internal Revenue.**

**No. 1001.**

District Court, E. D. Pennsylvania.

May 28, 1942.

William R. Spofford and Charles S. Jacobs, both of Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll, of Philadelphia, Pa., of counsel), for plaintiff.

Gerald A. Gleeson, U. S. Atty., of Philadelphia, Pa., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe, and Paul S. McMahon, Sp. Assts. to the Atty. Gen., for defendant.

KALODNER, District Judge.

This is an action for recovery of $15,-390.06 with interest, representing capital stock taxes and interest, paid by the plaintiff railroad to the Collector of Internal Revenue for the years ended June 30, 1934, 1935 and 1936.

The capital stock taxes were paid following denial of the plaintiff's claim for exemption on the ground that it was not doing business during the taxable periods involved. A jury trial was waived; the case came before the court on the pleadings, stipulation of facts, and some additional testimony.

The issue involved is:

What constitutes "carrying on or doing business" within the meaning of the applicable Internal Revenue Law (Sec. 701 of the Revenue Act of 1934, c. 277, 48 Stat. 680, 26 U.S.C.A. Int.Rev.Acts, page 787, and Sec. 105(a) of the Revenue Act of 1935, c.

829, 49 Stat. 1017, as amended by Sec. 401 of the Revenue Act of 1936, c. 690, 49 Stat. 1733, 26 U.S.C.A. Int.Rev.Acts, p. 943)?

The plaintiff corporation was organized in 1852 to construct and operate a steam railroad, and was empowered to exercise "all the privileges and franchise incident to a corporation".

In 1879 the plaintiff leased all of its tangible property—its entire road and equipment—to the Philadelphia & Reading Railway Company, predecessor of the present Reading Company, for a term of 999 years.

Since that time it has not operated a railroad. Its principal activities during the tax years involved were concerned with the maintenance of its corporate organization as required by its lease; the receipt of rent from the lessee; distributing dividends to stockholders; paying interest to bondholders; retention and management of approximately $600,000 of securities and an approximate $200,000 cash fund; receiving interest on its investments; and investment and re-investment of certain funds and securities, as will appear from the stipulated facts.

The Commissioner of Internal Revenue ruled that the investments and re-investments constituted "doing business".

The stipulated statement of facts, which is hereby adopted as the Findings of Fact, in part, of this court, is as follows:

1. The petitioner, The North Pennsylvania Railroad Company, is a corporation duly organized under the laws of Pennsylvania, with its office at 1421 Chestnut Street, Philadelphia, in the Eastern District of Pennsylvania.

2. On or before August 31, 1934, pursuant to the Revenue Act of 1934, plaintiff filed its return for 1934 capital stock tax covering the period July 1, 1933, to June 30, 1934, with defendant. In said return no declared value for petitioner's capital stock was set forth because plaintiff claimed exemption from capital stock tax on the ground that plaintiff did not carry on or do business during any part of the taxable period July 1, 1933, to June 30, 1934. On or about June 4, 1935, plaintiff's claim for exemption was denied by the Commissioner of Internal Revenue and plaintiff was required to declare a value for its capital stock which it did in the amount of $4,230,000. Thereafter, capital stock tax for the period July 1, 1933, to June 30, 1934, was assessed against plaintiff in the amount of $4,230 with interest of $574.35. Thereafter, defendant sent to plaintiff a "Notice and Demand for Tax" of the amount assessed, $4,230 with interest of $574.35. On December 21, 1935, plaintiff paid under protest to defendant at Philadelphia the amount of capital stock tax assessed against it for the period July 1, 1933, to June 30, 1934, to wit, $4,230 with interest of $574.35.

On or before July 31, 1935, pursuant to the Revenue Act of 1934, plaintiff filed its return for 1935 capital stock tax covering the period July 1, 1934, to June 30, 1935, with defendant. In said return no declared value for petitioner's capital stock was set forth because plaintiff claimed exemption from capital stock tax on the ground that plaintiff did not carry on or do business during any part of the taxable period from July 1, 1934, to June 30, 1935. On or about September 15, 1936, plaintiff's claim for exemption was denied by the Commissioner of Internal Revenue and plaintiff was required to compute an adjusted declared value for its capital stock, which it did in the amount of $4,312,019.96. Thereafter, capital stock tax for the period July 1, 1934, to June 30, 1935, was assessed against plaintiff in the amount of $4,312 with interest of $342.24. Thereafter, defendant sent to plaintiff a "Notice and Demand for Tax" of the amount assessed, $4,312, with interest of $342.24. On November 13, 1936, plaintiff paid under protest to defendant at Philadelphia the amount of capital stock tax assessed against it for the period July 1, 1934, to June 30, 1935, to wit, $4,312, with interest of $342.24.

4. On or before July 31, 1936, pursuant to the Revenue Act of 1935, as amended by the Revenue Act of 1936, plaintiff filed its return for 1936 capital stock tax covering the period July 1, 1935, to June 30, 1936, with defendant. In said return a declared value for petitioner's capital stock was set forth in the amount of $5,734,000, but this value was set forth under protest and plaintiff claimed exemption from capital stock tax on the ground that plaintiff did not carry on or do business during any part of the taxable period July 1, 1935, to June 30, 1936. On or about February 13, 1937, plaintiff's claim for exemption was denied by the Commissioner of Internal Revenue and capital stock tax for the period July 1, 1935, to June 30, 1936, was assessed against plaintiff in the amount of $5,734, with interest of $197.47.

Thereafter, defendant sent to plaintiff a "Notice and Demand for Tax" of the amount assessed, $5,734, with interest of $197.47. On March 19, 1937, plaintiff paid under protest to defendant at Philadelphia the amount of capital stock tax assessed against it for the period July 1, 1935, to June 30, 1936, to wit, $5,734, with interest of $197.47.

5. On or about April 22, 1938, plaintiff filed with defendant at Philadelphia claims for refund of capital stock taxes paid for the periods July 1, 1933, to June 30, 1934; July 1, 1934, to June 30, 1935; and July 1, 1935, to June 30, 1936, in the amounts of $4,804.35, $4,654.24 and $5,931.-47, respectively, on Forms 843, and alleged as the bases therefor that plaintiff was not subject to capital stock tax under the provisions of Section 701(c) (3) of the Revenue Act of 1934, and Section 105(a) of the Revenue Act of 1935, as amended by Section 401 of the Revenue Act of 1936, because of the facts set forth therein. Said claims for refund were filed under the provisions of Section 3220 of Revised Statutes, as amended by c. 852, sec. 619(b), 45 Stat. 878, and c. 901, sec. 3, 45 Stat. 996 (incorporated into the Internal Revenue Code as Section 3770(a) (1). A true and correct copy of the claim for refund of capital stock tax for the period July 1, 1933, to June 30, 1934, is attached hereto and made part hereof, marked Exhibit "A". A true and correct copy of the claim for refund of capital stock tax for the period July 1, 1934, to June 30, 1935, is attached hereto and made part hereof, marked Exhibit "B". A true and correct copy of the claim for refund of capital stock tax for the period July 1, 1935, to June 30, 1936, is attached hereto and made part hereof, marked Exhibit "C". In a letter dated December 1, 1938, the Commissioner of Internal Revenue advised the plaintiff that its claims for refund (Exhibits "A", "B" and "C" above) were rejected in full. A true and correct copy of the Commissioner's letter of December 1, 1938, is attached hereto and made a part hereof, marked Exhibit "D".

6. Petitioner was organized under a special act of the Pennsylvania Legislature, approved April 8, 1852, P.L. 654, entitled "An Act to Incorporate the Philadelphia, Easton and Water Gap Railroad Company". A true and correct copy of said act is attached hereto and made a part hereof, marked Exhibit "E". Letters Patent were issued to petitioner on July 9, 1852, by F. W. Hughes, Secretary of the Commonwealth. A true and correct copy of the Letters Patent are attached hereto and made a part hereof, marked Exhibit "F". Petitioner's name was changed to "The North Pennsylvania Railroad Company" by Section 11 of a special act of the Pennsylvania Legislature, approved April 18, 1853. A true and correct copy of said section is attached hereto and made a part hereof, marked Exhibit "G". On May 14, 1879, petitioner leased all of its tangible property to the Philadelphia & Reading Railway Company (predecessor of The Reading Company, the lessee at present and during all times material to this action). A copy of said lease is attached hereto, marked Exhibit "H," and made a part hereof. From that time to the present petitioner has not engaged in the business or prime object for which it was incorporated, namely, constructing and operating a steam railroad, this activity having been carried on by the lessee company, which company was liable for and paid federal capital stock taxes for the periods here involved.

7. Petitioner's investments represent the growth of two separate funds. The first of these, which appears on petitioner's general balance sheet (prepared in accordance with the requirements of the Interstate Commerce Commission), under the heading, "Other Investments", represents the investment of bank interest allowed petitioner by its depositaries on rental payments received from its lessee and deposited pending distribution to shareholders and bondholders. Rental payments are received by petitioner quarterly on the first of February, May, August, and November of each year. The policy of petitioner has been to make dividend distributions on the twenty-fifth of February, May, August, and November; and interest on indebtedness is payable on the first of May, July, November, and January. These differences between the dates of receipts and distributions create a situation where there has always been a substantial amount of cash in petitioner's treasury awaiting distribution, which sum has borne interest in the past at varying rates as high as 3%. These interest earnings have been invested from time to time, and the earnings thereon have been accumulated and invested.

8. The second fund, or the Contingent Fund, which is carried in the balance sheet submitted to the Interstate Commerce Commission under the designation, "Insurance and Other Funds", had its origin in a resolution of the Board of Directors adopted at a meeting held on June 17, 1879, which provided: "Resolved, that whenever quarterly dividends shall be declared by this Company, that 5% of the amount be retained as a Contingent or Surplus Fund the same to be invested by the President and Finance Committee as they may deem best for the interest of the Company."

Deductions from dividends and resulting additions to Contingent Fund continued until August 8, 1882, when the Board of Directors adopted the following resolution: "Resolved, that on and after the payment of the dividend to be declared in May, 1883, the stockholders shall be paid the full amount of the dividend declared, provided, however, that no unforeseen or un-expected event occurs rendering it unwise to discontinue the retention of the said 5%."

The total of this fund up to and including the dividend payment of May 25, 1883, amounted to $55,151.84. Since that time there have been no additions to this fund other than through profits on sales of securities and by the accumulation of its own earnings. At the time of the creation of the fund the Board of Directors did not define the purpose thereof other than to name it a "Contingent or Surplus Fund". In 1879, when the lease was executed, the equipment which stood on petitioner's books at approximately $1,750,000 was appraised in accordance with the terms of the lease and the amount of the appraisal, approximately $650,000, was agreed to by both parties at that time. Under the terms of the lease the lessee is required to return to petitioner only equipment of that value upon the termination of the lease. This shrinkage of $1,100,000, coupled with an impairment of capital at the time the lease was executed, required the establishment of a fund in order that no question be raised as to the propriety of dividend distributions while such condition existed, and further, its maintenance has been necessary so that petitioner will be in a position to take over and operate its property in the event of a breach of the lease.

9. A true and correct list of all purchases, sales and maturities of petitioner's investments from January 1, 1921, through December 31, 1939, is attached hereto, marked Exhibit "I", and made a part hereof.

10. A true and correct copy of petitioner's balance sheet as of October 31, 1880, that being the available balance sheet closest in point of time to the leasing of petitioner's property, is attached hereto, marked Exhibit "J", and made a part hereof.

11. True and correct copies of petitioner's balance sheets as of June 30, 1934, June 30, 1935, and June 30, 1936, are attached hereto, marked Exhibits "K", "L" and "M", respectively, and made a part hereof.

12. True and correct copies of petitioner's receipts and disbursements for the periods from July 1, 1933 to June 30, 1934; from July 1, 1934 to June 30, 1935; and from July 1, 1935 to June 30, 1936, are attached hereto, marked Exhibits "N", "O" and "P", respectively, and made a part hereof.

13. A true and correct list of petitioner's dividend payments for the period May 14, 1879 to June 30, 1936, both dates inclusive, is attached hereto, marked Exhibit "Q", and made a part hereof.

14. True and correct copies of all minutes of all meetings of petitioner's Board of Directors and stockholders held during the period July 1, 1933, to June 30, 1936, are attached hereto and made a part hereof, marked Exhibit "R" (36 pages).

15. Itemized lists of securities and cash in each of the two funds referred to in Paragraphs 7 and 8 hereof, on June 30th of each of the years 1932 to 1939, inclusive, are attached hereto and made a part hereof, marked Exhibit "S" (7 pages). On June 30th of each year, the cash balance was substantial because on the next day, i.e., July 1st of each year, $74,250 was paid out as interest on petitioner's second mortgage and because by that date each year about $10,000 had been accumulated toward payment of first mortgage interest payable November 1st of each year.

16. No part of petitioner's claim, amounting to $15,390.06, with interest on $4,804.35 from December 21, 1935, on $4,654.24 from November 13, 1936, and on $5,931.47 from March 19, 1937, has been assigned or transferred; no part thereof has been repaid to petitioner; and there are no credits or offsets against said claim.

17. The Commissioner of Internal Revenue granted exemption to the plaintiff, The North Pennsylvania Railroad Company, from the payment of capital stock tax imposed by Section 1000 of the Revenue Act of 1918, 40 Stat. 1126, for each of the years ended June 30, 1919, and 1920, upon the ground that the property of the plaintiff was being operated by the Railroad Administration of the Federal Government.

18. The Commissioner of Internal Revenue granted exemption to the plaintiff from the payment of capital stock tax imposed by Section 1000 of the Revenue Act of 1921, 42 Stat. 294, and Section 700 of the Revenue Act of 1924, 26 U.S.C.A. Int.Rev.Acts, page 96, for each of the years ended June 30, 1921, to 1926, inclusive, on the ground that the plaintiff was not carrying on or doing business during those years.

In addition to the agreed statement of facts, I make the following special findings of fact:

19. For the tax period ended June 30, 1933, plaintiff filed a capital stock tax return claiming exemption on the ground that it was not engaged in or doing business. This claim was denied by the Commissioner of Internal Revenue, who assessed capital stock tax and interest against plaintiff, which amount was paid. Subsequently plaintiff filed a claim for refund and after rejection of the claim by the Commissioner, instituted suit against the United States in this court for recovery of the tax and interest paid. Prior to trial the Attorney General conceded plaintiff's position and authorized an administrative refund of the tax and interest paid.

20. During the tax periods involved in this proceeding there was no substantial change in the activities of the plaintiff as compared with the years ended June 30, 1919 to 1926, inclusive, and also as compared with the year ended June 30, 1933, with the exception of some slight additional activity with respect to the matter of the purchase and sale of securities for investment, due to a desire to obtain greater diversification of the investment portfolio.

21. The principal activities of the corporation during the tax years involved were concerned with the maintenance of the corporate existence (as required under the terms of the lease); the receipt of rent from the lessee; retention and management of securities of a value of approximately $600,000, and a cash fund of approximately $200,000; distributing dividends to stockholders; paying interest to bondholders; keeping the books of account of the company; making up tax reports for filing with the federal government and with the Commonwealth of Pennsylvania; making up reports for the Interstate Commerce Commission and the Pennsylvania Public Utility Commission; keeping the stock transfer books and making the physical transfer of stock therein and issuing new certificates; keeping the registered bond transfer book and making the physical transfers therein; receiving interest on investments of the plaintiff; cutting coupons from the coupon bonds of the plaintiff and making deposits of amounts so received; sending notices of meetings of stockholders and of the Board of Directors.

22. Plaintiff's stockholders met once a year to elect directors, and the directors met quarter-annually to declare dividends and to transact such other business concerned with the internal affairs of the company as was required. Plaintiff had a standing Finance Committee.

23. Plaintiff did not maintain its organization for the purpose of continued effort in the pursuit of profit or gain but primarily for the purpose of preserving its corporate existence, as required by the lease, and conserving its capital.

24. Substantially all of the sales made by plaintiff during the years here involved were made in anticipation of maturity except that during the period from June 4, 1934, to August 1, 1934, several sales were made to achieve diversification. Purchases were made with the proceeds of such sales or with the proceeds of securities which were called or paid off, and all purchases were made with the primary purpose of conserving capital rather than with a view toward realizing profits thereon. In managing such investments the company's officers also sought to obtain a fair rate of income on the securities commensurate with the primary motive of safety of investment.

25. Under the terms of the railroad property lease plaintiff collected $650,344 as rental, plus $12,000 as a contribution to maintenance expense during each of the capital stock tax taxable years 1934 to 1936, inclusive, and distributed to its shareholders as dividends $441,780 each year out of the rentals received.

26. Under the terms of the lease plaintiff was required to and did maintain its

corporate existence during the taxable periods involved. Plaintiff held title to the railroad property covered by the lease, and plaintiff was required to, and did, stand ready at any time if called upon to exercise any of its corporate powers to enable its lessee to utilize the property to advantage and to operate the railroad.

27. Subsequent to the lease of its road and equipment in 1879, the plaintiff established a "general fund" and "contingent fund". The general fund represented funds realized from interest on deposits of rentals received by the plaintiff and deposited pending distribution to shareholders and bondholders. The contingent fund was created on June 17, 1879, and was obtained by withholding 5% of the quarterly dividends with the apparent purpose of building up a fund to offset the shrinkage in the value of the leased equipment (as demonstrated by an appraisal made in the year 1879) and apparently also to cover future depreciation. There were no further contributions to this fund after May, 1883, by the stockholders or through the withholding of a portion of the dividends; the accumulations to the fund since that time have practically all resulted from income on the investments made from this fund. For the three tax periods involved the amount of cash and securities in the general fund was approximately $350,000 and the amount in the contingent fund was approximately $425,000.

28. No distributions to shareholders have ever been made from either of these special funds, but all interest and dividends accrued and profits on sales have been reinvested. Eight per cent dividends were paid out of rental income.

29. Securities in both accounts were mostly bonds (railroad and municipal), but in recent years diversification has been sought and in the taxable year 1935 plaintiff purchased $25,000 worth of common stock, and in 1937, $10,000 worth of common stock.

30. Plaintiff's president is a financial expert and is paid $3,000 per year for devoting 3% or 4% of his time to the company's affairs. With the concurrence of the company's Finance Committee, he determines the securities to be bought or sold. The president of the company kept in close contact with the market and invested in securities yielding the highest return consistent with safety. A substantial part of the time devoted by the president to the plaintiff's affairs was concerned with matters relating to the maintenance of the corporate organization.

32. During the 1934 taxable period, plaintiff bought five separate blocks of securities for approximately $77,000 and sold six blocks for approximately $101,000. In the 1935 period, eight blocks of securities were purchased for approximately $129,000 and ten blocks sold for approximately $207,000. In the 1936 period, five blocks were purchased for $102,000 and one block sold for $1,000.

33. Plaintiff's receipts as dividends and interest upon its investments were approximately $25,000 per year during the taxable periods involved.

34. During the tax years involved, the plaintiff employed an auditor at $600 per year; a clerk at $1,300 per year; its president was paid $3,000 per year; its treasurer $4,000 per year; and its secretary $3,240 per year. Plaintiff maintained an office for which it paid $1,350 per year rental. It owned and kept books of account, office furniture and equipment. The office expense, exclusive of rent, was $500 or $600 per year. Directors were paid $20 each for attendance at the quarterly meetings.

35. The plaintiff's activities, its maintenance of its investments, and the infrequent purchase and sale of securities, did not constitute carrying on or doing business.

### Discussion.

The question here involved is whether the activities of the plaintiff during the years ended June 30, 1934, June 30, 1935, and June 30, 1936, constituted "carrying on or doing business" within the meaning of the applicable Internal Revenue Acts.

Section 701 of the Revenue Act of 1934, c. 277, 48 Stat. 680, provides as follows:

"(a) For each year ending June 30, beginning with the year ending June 30, 1934, there is hereby imposed upon every domestic corporation with respect to carrying on or doing business for any part of such year an excise tax of $1 for each $1,000 of the adjusted declared value of its capital stock.

\* \* \* \* \*

"(c) The taxes imposed by this section shall not apply—

\* \* \* \* \*

"(3) to any domestic corporation in respect of the year ending June 30, 1934, if

it did not carry on or do business during a part of the period from the date of the enactment of this Act to June 30, 1934, both dates inclusive * * *." 26 U.S.C. A. Int.Rev.Acts, page 787.

Section 105(a) of the Revenue Act of 1935, c. 829, 49 Stat. 1017, as amended by Section 401 of the Revenue Act of 1936, c. 690, 49 Stat. 1733, 26 U.S.C.A. Int.Rev. Acts, page 943 is substantially the same as the above.

Plaintiff and defendant alike cite Article 42 and Article 43 of Treasury Regulations 64 (1936 Ed.), which read as follows:

"Art. 42. *Doing business.*—The term 'business' is very comprehensive and embraces whatever occupies the time, attention, or labor of men for profit. Accordingly, regardless of the nature of its activities, any corporation organized for profit and carrying out the purpose of its organization is doing business within the meaning of the Act. Similarly, even if not organized for profit, any corporation which nevertheless engages in activities ordinarily carried on for profit is also doing business. It is immaterial whether the activities result in a profit or a loss, whether the corporation has been successful in its enterprise, or that because of unfavorable business conditions, no operations are carried on for a particular period. No particular amount of business need be done, nor is it necessary that the business be continuous throughout the taxable year.

"The case is exceptional in which the activities of a corporation organized for profit do not amount to doing business within the meaning of the Act. Such a case is generally limited to one in which the corporation is not pursuing the ends for which organized, i. e., profit.

"Art. 43. *Illustrations.*—(a) *General.*— In general 'doing business' includes any activities of a corporation whether it engages in—

"(1) buying, selling, manufacturing, developing, financing, speculating or otherwise dealing in property of any description;

"(2) furnishing services of any character;

"(3) leasing or managing properties, collecting rents or royalties;

"(4) managing, financing, controlling or directing the operations, performing any function, or, in any other way, aiding or serving the general purposes of any affiliated or related company;

"(5) the orderly liquidation of property by negotiating sales from time to time as opportunity and judgment dictate and distributing the proceeds as liquidation is effected—for example, the liquidation of an estate, or of properties taken over from another corporation, or of the shareholders' fractional interests in particular property; or

"(6) any other activities coming within the ordinary and natural significance of the term 'carrying on or doing business.'

"(b) *Exceptions.*—Ordinarily the exceptions to 'doing business' are restricted to limited activities of a corporation, such as—

"(1) the issuance and sale of its stock for cash as a preliminary step in the completion of its organization; or

"(2) *the distribution of the avails of property and the doing only of such acts as may be necessary for the maintenance of its corporate status in the case in which the corporation either was organized for, or has reduced its activities to, the mere owning and holding of specific property.* (Emphasis supplied.)

"Nor will a corporation be regarded as 'doing business' if it has no activities, because it has—

"(3) become dormant; or

"(4) completed its business, as, for example, a real estate subdivision developed, sold and reduced to cash; or

"(5) abandoned its business, as, for example, where prospective oil properties are proven worthless.

"If the corporation's activities are not so limited as outlined in the preceding paragraph, it will be regarded as 'doing business' within the meaning of the Act. Thus, a corporation is 'doing business' if—

"(A) In addition to the activities described in paragraph (b) (1) it engages in any other activity such as the making of contracts, the buying of materials or machinery, the construction of buildings, or the employing or discharging of individuals; or

"(B) in addition to the activities described in paragraph (b) (2) it engages in any other activity, such as (i) in the case of a company holding securities, *the investment or reinvestment of surplus or other funds in excess of an amount neces-*

*sary to maintain its original investments;* or (ii) in the case of a company which had leased its property to another, the maintaining or keeping the property in repair in accordance with the terms of the lease, or in other activities necessary to enable the lessee properly to manage the leased property, regardless of whether such activities are performed on behalf and under the order of the lessee or that such acts are not of major importance; or

"(C) although it retires from its principal business it nevertheless engages in other business activities or maintains its organization for the purpose of continued effort in the pursuit of profit or gain." (Emphasis supplied.)

The defendant concedes that the decision as to whether a corporation is "carrying on or doing business" must, in each instance, depend upon the particular facts before the court.

The question as to what constitutes "carrying on or doing business" within the meaning of the Federal Capital Stock Tax Statutes, and the Regulations promulgated thereunder by the Commissioner of Internal Revenue, has been a vexatious problem for many years.

The Supreme Court of the United States, in Magruder, Collector, v. Washington, Baltimore and Annapolis Realty Corporation, 316 U.S. 69, 62 S.Ct. 922, 924, 86 L.Ed. ——, opinion filed April 13, 1942, in discussing what constitutes "carrying on or doing business", stated: "The crucial words of the statute, 'carrying on or doing business', are not so easy of application to varying facts that they leave no room for administrative interpretation or elucidation. To be sure, in many, if not in most instances, the factual situation will be so extreme as to leave no doubt whether a corporation is doing business or not. But the nuances of facts between the two extremes have produced a nebulous field of confusion which has been recognized by courts striving to fit close cases into one category or the other [citing cases]. Interpretative regulations, such as Article 43(a) (5), are appropriate aids toward eliminating that confusion, and uncertainty. Cf. Helvering v. Wilshire Oil Co., 308 U.S. 90, 102, 60 S.Ct. 18, 25, 84 L.Ed. 101; Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. ——."

Further, in a footnote to its opinion, the Supreme Court said: "The decisions of this Court illustrate the difficult problems of classification encountered [citing cases]."

While the Magruder case, supra, is not factually similar to the one at bar, it involves the question: what constitutes "carrying on or doing business" under the capital stock tax statutes?

The action there was for refund of capital stock taxes. The taxpayer was organized by a protective committee for the bondholders of a defunct railway for the purpose of liquidating certain properties formerly belonging to the railroad which the committee had acquired through foreclosure. The Supreme Court held that the liquidating activities of the taxpayer constituted doing business in accordance with interpretative regulation, Article 43(a) (5), supra, and that Article 43(b) (2) was not applicable.

Said the court: "During the period in question respondent did not fall into that state of quietude, covered by the specific language of Article 43(b) (2), in which it was merely owning and holding specific property and distributing the resulting proceeds. See Zonne v. Minneapolis Syndicate, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428; cf. Von Baumbach v. Sargent Land Co., 242 U.S. 503, 516, 517, 37 S.Ct. 201, 204, 61 L.Ed. 460. On the contrary, respondent was actively engaged in fulfilling the purpose of its creation, the liquidation of its holdings for the best obtainable price."

In my opinion, the operations of the plaintiff in the instant case fall within the description—"that state of quietude"—so aptly phrased in the Magruder opinion.

Preliminarily, it must be kept in mind that the Commissioner had previously ruled that the plaintiff was not subject to capital stock taxes for the years 1921 to 1926, inclusive, on the ground that the plaintiff was not carrying on or doing business during that period (Findings of Fact, Nos. 17 and 18).

As to the year ended June 30, 1933, the Commissioner ruled that the plaintiff was doing business and therefore was taxable; and then, after the payment of the tax and filing of a suit for refund, an administrative refund was granted for the tax paid for that year.

Thus, the imposition of tax by the Commissioner for the years ended June 30, 1934, June 30, 1935, and June 30, 1936, constituted a reversal of policy on his part, inasmuch as there was no change in the activities of

the corporation during the latter years. With this statement, I come now to consideration of the question whether the plaintiff—independent of any prior rulings of the Commissioner—was subject to capital stock tax for the years 1934, 1935 and 1936. The government practically concedes that were it not for the activities of the plaintiff with respect to its investments, the plaintiff would be entitled to a refund. The government contends, however, that the activities of the plaintiff with respect to its investments during those years was of such a character as to bring the plaintiff within the sphere of tax liability.

The government emphasizes that the plaintiff during the three years in question maintained investments in securities in the approximate amount of $600,000, in addition to a substantial cash balance. It stresses that there were a number of changes made in the investments by means of purchases and sales of securities. The government has conceded, however, that most of the activity during the years 1934 and 1935 was due to a desire to diversify the investment portfolio, and there is ample corroboration for this fact in the testimony of the president of the plaintiff corporation. It also seems to be undisputed that some of the activities with respect to investments during the years in question were due to the necessity of reinvesting the funds received from matured securities.

The government also points to the fact that the annual income from the investments was about $25,000, which income apparently was left to accumulate as an addition to two special funds.

While concededly the officers of the plaintiff were eager to keep the funds invested in securities which yielded as high a return as possible consistent with conservative investment, there is no doubt that there was no attempt at speculation nor was there any general trading in securities in any of the years involved. Such relatively few purchases and sales as were made in these tax years were plainly for the purpose of either replacing matured securities or diversifying the investment portfolio.

■ I have concluded that the plaintiff since 1879 has restricted its activities to "the distribution of the avails of property and the doing only of such acts as may be necessary for the maintenance of its corporate status in a case where the corporation has reduced its activities to the mere owning and holding of specific property" Art. 43(b) (2), and that the plaintiff, which is "a company holding securities", has not in the taxable periods involved engaged in "the investment or reinvestment of surplus or other funds *in excess* of an amount necessary to maintain its original investments" Art. 43(B).

In making this finding I have noted that at the time of the lease of all of its road and equipment to the Reading Company, the lease provided for an appraisal of the equipment. This equipment was carried on the books of the plaintiff immediately prior to the lease in an amount of approximately $1,750,000. It was appraised at the time of the lease at $650,000, and the lease provides that at the conclusion of the term of the lease (999 years) equipment of the value of $650,000 is to be returned by the lessee to the plaintiff. There existed, therefore, a shrinkage of about $1,100,000 in the value of the equipment based upon this appraisal. In addition, the equipment naturally would become fully depreciated long before the expiration of the lease. It is obvious, therefore, that in order to maintain the capital intact, some reserve fund would be required. The evidence is that the creation of the contingent fund by the plaintiff in the year 1879 by setting aside 5% of the amount of the fixed annual dividends was to accomplish the purpose of maintaining such capital intact, and thus avoid any question with respect to the propriety of the dividend distributions (see Stipulation of Facts No. 8).[1] It was also stipulated that another reason for maintaining this contingent fund was for the purpose of enabling the plaintiff to be "in a position to take over and operate its property in the event of a breach of the lease" (Stipulation of Facts No. 8).

■ We therefore have this situation: The two funds combined (general fund and contingent fund) did not in any one of the three tax years exceed $800,000. In contrast, there was a capital impairment based upon the equipment appraisal (without considering depreciation) of $1,100,000. I have also taken into consideration the fact that the railroad equipment which was leased in 1879 had in all probability (although

---

[1] The reasons for the discontinuance of the policy of adding to this contingent fund except by accretions in the form of income on investments do not clearly appear on the record.

nothing appears on the record) become fully depreciated prior to June 30, 1934, and the balance sheets of the plaintiff corporation which are included in the Stipulation of Facts [2] show no other funded reserve to take care of this depreciation in equipment. There is an unfunded reserve in the amount of $400,000 shown under the liabilities which is entitled "Accrued Depreciation Equipment." It is to be noted that the liability set up for such accrued depreciation is a flat figure which has not been added to in the later years. It further appears that the book value of equipment in the amount of approximately $1,750,000 which existed as of the time of the lease (1879), is still carried in the later balance sheets at about the same figure, offset only by the said depreciation reserve. I believe it is fair to say that in all probability all of the original leased equipment was scrapped prior to the year 1934. The only obligation of the lessee is to replace equipment of a value of $650,-000 at the end of the term of the lease. There seems to be little question, therefore, that the general and contingent funds which have been maintained by the plaintiff were not in excess of an amount necessary to maintain the original investments, and hence under the Commissioner's regulations the investment and reinvestment of such funds did not constitute "doing business" when added to the other activities of the corporation in the mere holding of property and the distribution of its avails.

While I have concluded that the plaintiff was not doing business in the tax periods involved within the meaning of the Commissioner's own regulations (which regulations I hold to be valid in line with the Magruder decision), it might be said that if the Commissioner is dissatisfied with the effect of these regulations in situations of the character dealt with in this case, he can very easily amend his regulations if he deems it advisable to do so, consistent, of course, with the reasonable interpretation of the taxing statute.

It may be noted that in the 1938 revision of Regulations 64 there has been some change made by the Treasury Department with respect to the wording of that portion of Art. 43 which has been applied in the present case. No opinion is expressed here with respect to the effect of such change.

The government makes no claim that that portion of the regulations which is applicable to this case is invalid, but it may be briefly stated that as far back as 1913, in the case of McCoach v. Minehill and S. H. Railway Company, 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842, it was held, in a factual situation very closely resembling the facts here, that a railroad company which had leased its equipment for a long period and thereafter merely maintained its corporate organization and invested its funds in securities, was not doing business within the meaning of the Corporation Excise Tax Act of August 5, 1909, 36 Stat. 11. [3]

The decision in the McCoach v. Minehill case has been followed in a large number of other cases. While the government argues that there was a strong dissenting opinion in the McCoach v. Minehill case, and attempts to show that the trend of recent decisions is not in accordance with the views expressed in the Minehill case, I do not find that it has ever been overruled,

---

[2] Exhibits K, L, M· of Stipulation of Facts.

[3] Said the Supreme Court at pages 306, 307, 308 of 228 U.S., at page 424 of 33 S.Ct., 57 L.Ed. 842:

"In our opinion the mere receipt of income from the property leased (the property being used in business by the lessee, and not by the lessor) and the receipt of interest and dividends from invested funds, bank balances, and the like, and the distribution thereof among the stockholders of the Minehill Company, amount to no more than receiving the ordinary fruits that arise from the ownership of property.

\*   \*   \*   \*   \*   \*

"The distinction is between (a) the receipt of income from outside property or investments by a company that is otherwise engaged in business; in which event the investment income may be added to the business income in order to arrive at the measure of the tax; and (b) the receipt of income from property or investments by a company that is not engaged in business except the business of owning the property, maintaining the investments, collecting the income, and dividing it among its stockholders. In the former case the tax is payable; in the latter not."

For discussion of liability of such a company for Federal Income Tax, see United States v. Joliet & Chicago R. R. Co., 315 U.S. 44, 62 S.Ct. 442, 86 L. Ed. ——, decided Jan. 19, 1942. See, also, Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas. 1912B, 1312.

and it appears that the case has been cited without disapproval by the United States Supreme Court in a number of later cases, including the Magruder case, supra.[4]

It is apparent that the Commissioner's regulations (1934 and 1936 Ed.) dealing with the problem here presented were drawn in accordance with the decisions of the United States Supreme Court in cases such as McCoach v. Minehill, supra, and I have no doubt that the Commissioner's regulations are valid and cover the factual situation presented in this case.

In summary, I find:

(1) That the plaintiff had retired in the year 1879 from the business for which it was incorporated, namely, the operation of a railroad;

(2) That since that time, and particularly during the years in question, it has maintained its corporate existence primarily for the distribution of the avails of its property and for the doing of only such acts as were necessary for the maintenance of its corporate status, and has reduced its activities to the mere owning and holding of property; and

(3) That the investment or reinvestment of its funds was not in excess of an amount necessary to maintain the original investments of the company.

Accordingly, the plaintiff's operations squarely come within the provisions of Article 43(b) (2) (B) (1936 Ed.) and Art. 33 (1934 Ed.); and under the terms of these regulations the plaintiff was not "doing business" and hence not liable for federal capital stock taxes for the years ended June 30, 1934, June 30, 1935, and June 30, 1936; and is, therefore, entitled to judgment in this suit for refund.

I state the following conclusions of law:

1. This court has jurisdiction of this case under the provisions of the Act of March 3, 1911, 36 Stat. 1092, 28 U.S.C.A. § 41(5), it being a case arising under a law providing for internal revenue.

2. During the capital stock tax years ended June 30, 1934, 1935, and 1936, plaintiff was a nonoperating railroad company which had reduced its activities to maintaining its corporate existence and collecting the interest and dividends from its investments, maintaining and reinvesting its securities, distributing to its stockholders and bondholders rental received from its lessee, and to doing only those acts which were necessary to continue that status.

3. The maintenance by plaintiff of its investments and the infrequent purchase and sale of securities not in excess of an amount necessary to maintain its original investments, does not constitute carrying on or doing business under Section 701 of the Revenue Act of 1934, and Section 105 of the Revenue Act of 1935, as amended by Section 401 of the Revenue Act of 1936, and the Treasury Regulations in effect during the years 1934, 1935, and 1936.

4. During no part of the taxable years ended June 30, 1934, 1935, and 1936, was plaintiff carrying on or doing business within the meaning of Section 701 of the Revenue Act of 1934, and Section 105 of the Revenue Act of 1935, as amended by Section 401 of the Revenue Act of 1936, and the applicable Treasury Regulations (Art. 33, 1934, Ed., and Art. 43, 1936 Ed.).

5. There was probable and reasonable cause for the act of the defendant, the Collector of Internal Revenue, in demanding and collecting from the plaintiff the internal revenue taxes and interest for the refund of which judgment is to be entered.

6. The taxes and interest sought to be recovered by plaintiff in this case were illegally assessed and collected from plaintiff by defendant, and by reason thereof plaintiff is entitled to judgment against the defendant for the amount of taxes and interest so illegally assessed and collected from plaintiff, with interest thereon at the rate of 6% per annum from the dates said taxes and interest were paid.

Defendant's exceptions have been noted and granted to the declination of the following numbered requests for findings of fact and conclusions of law:

---

[4] See, also, Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; United States v. Pyne, 313 U.S. 127, 61 S.Ct. 893, 85 L.Ed. 1231; City Bank Farmers Trust Co., Trustee under the Will of Angier B. Duke, v. Helvering, 313 U.S. 121, 61 S.Ct. 896, 85 L. Ed. 1227; McCoach v. Continental Passenger Railway Co. of Philadelphia, 3 Cir., 233 F. 976; S. Makransky and Sons, Inc., v. United States, 40-2 U.S. T.C. paragraph 9713 (E.D.Pa.1940); Southwestern Railroad Co. v. United States, 38-1 U.S.T.C. paragraph 9147; Welch v. Nashua and Lowell Railroad Corp., 1 Cir., 1940, 115 F.2d 920.

As to requests for findings of fact: Nos. 17, 20, 21, 22 (covered), 26 (covered), 29 and 31.

As to requests for conclusions of law: Nos. 1, 2, 3, 4, 5, 6, and 7.