### WISCONSIN CENT. RY. CO. v. UNITED STATES.

### No. J–20.

Court of Claims.
June 2, 1930.

880

881

Lyndon H. Baylies, of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen. (McClure Kelley and C. M. Charest, both of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and LITTLETON, GREEN, and WILLIAMS, Judges.

WILLIAMS, Judge.

This is a suit to recover the sum of $12,-336.47, assessed against the plaintiff and paid by it under the provision of section 1000 of the Revenue Act of 1918 (40 Stat. 1057, 1126), as capital stock taxes for the taxable year ending June 30, 1921.

The plaintiff company was incorporated in July, 1899, for the purpose of maintaining and operating certain lines of railway already constructed, extending from Chicago, Ill., Minneapolis and St. Paul, Minn., and certain points in Wisconsin and Michigan. These lines connected at Minneapolis and St. Paul, and also at Duluth and Superior, Wis., with the lines of the Minneapolis, St. Paul and Sault Ste. Marie Railway Company, commonly known as the Soo company, which owned and operated a railway system extending westward from Minneapolis to the state of Montana, northward to the Canadian border, and eastward into the states of Wisconsin and Michigan.

The Soo company's principal traffic consisted of grain, livestock, lumber, and forest products, originating on its own lines. It desired to obtain an outlet for this traffic to Chicago and to obtain the advantage of an interchange of traffic with the trunk line railroads having their termini in that city. On April 1, 1909, the plaintiff and the Soo company entered into a contract whereby it was agreed that the Soo company should operate the plaintiff's railways for a period of

John L. Erdall, of Minneapolis, Minn. (George F. Snyder, of Washington, D. C., on the brief), for plaintiff.

99 years. The reasons actuating the plaintiff and the Soo company in entering into the said agreement is set out in the following pertinent paragraphs of the preamble of the said contract, which reads as follows:

"Whereas, the lines of railway of the lessor and the lessee are so situated at some points that they can be lawfully connected and operated together to constitute one continuous main line, and at other points are connecting and intersecting, and the lessee is authorized to lease and operate the lines of railway of the lessor; and

"Whereas, it is deemed for the best interests of the parties hereto that these various lines of railway should be operated together, while still retaining the separate corporate existence and status in law of the parties hereto; and

"Whereas, in order to effectuate and carry out such purpose, it is essential that there should be but one management and one administration of the operation of the two systems of railway. * * * "

In article one of the instrument the lessor let and demised to the lessee its railways and other properties.

Article two reads as follows: "The lessee shall, immediately upon the execution of this agreement, have sole control of all said properties and of all operations of said railways, and of every part thereof, and all officers, agents, and employees of the lessor having to do with such control and operation, shall yield prompt and complete obedience to the authority of the lessee with respect to the control and operation of said railways, and other properties covered hereby."

In article three the lessee is granted sole control of all the funds and other assets of the lessor.

Article four provides in part as follows: "The lessor shall and will maintain during the existence of this lease its corporate existence and organization, and shall and will from time to time, and at all times when necessary, do each and every and all lawful acts requisite to renew, perpetuate, and maintain its corporate existence and organization, and shall and will exercise each and every corporate act which it can now, or at any time hereafter may lawfully exercise to enable the lessee to enjoy and avail itself of and exercise every right, franchise, and privilege hereby granted, and to properly manage and operate the demised premises according to the terms of this lease, and the lessor shall not and will not commit or omit, and shall not

suffer or allow to be committed or omitted, any act whereby the possession, management, and operation by the lessee of the demised premises shall be in any wise abridged or obstructed, or by which the corporate existence and powers of the lessor may be in any wise annulled, abridged, or affected. * * * "

In article five the lessee is granted the right to manage, operate, and administer all the railways and other properties covered by the lease, with the following proviso:

" * * * if in the judgment of the lessee it becomes necessary or expedient to operate any of said railways, terminal facilities, or other appurtenances owned by the lessor, or the use of which is secured to it by lease or other contract, permit, or privilege, by and through the corporate organization of the lessor, the lessee shall have the full right and power to require such operation by the lessor under the direction and supervision, however, of the lessee: And, provided further, That all expense of such management and administration shall be paid out of the earnings of the properties hereby demised." Article six reads as follows: "The lessor shall and will from time to time hereafter make, do, seal, execute, acknowledge, and deliver, or cause to be made, done, sealed, executed, acknowledged, and delivered, all and such further acts, matters, things, contracts, agreements, leases, and assurances in the law for better assuring and confirming unto the lessee all and singular the premises, estates, leaseholds and property hereby demised, or intended so to be, as shall be necessary or proper for better effectuating and carrying out the provisions, objects, and purposes of this lease, as may be required by the lessee."

Article nine contains the following provisions: "The lessor shall provide for such reasonable changes and improvements of its railway and equipment covered hereby, and for the building, lease, or purchase of such reasonable additional railway and equipment as the parties hereto shall from time to time determine for the best interest of the properties of the lessor covered hereby, and shall supply the necessary funds for said purposes in such manner and upon such securities as it shall, with the consent of the lessee, determine to be best: Provided, however, That if the lessor shall be unable to supply such necessary funds in the manner and upon the securities consented to by the lessee, then the lessor shall not be required to provide such changes, improvements, additional railway or equipment."

Article ten provides that the lessee shall have the right to purchase additional rolling stock and equipment, to be paid for by the lessor.

Article eleven provides for the payment of dividends to the stockholders of the lessor from net earnings.

Article fifteen contains the following: " * * * All expenses that may be incurred for the joint benefit of the railway of the lessor and the railway of the lessee shall be borne by the lessor and lessee in such fair and equitable proportion as may be agreed upon by the parties hereto. * * * "

Articles sixteen, seventeen, and eighteen contain covenants and agreements that the lessee shall pay interest, taxes, and other expenses out of earnings of the demised railways; shall keep the properties insured; and shall assume and perform all contractual obligations of the lessor.

Article nineteen reads as follows: "The lessee hereby covenants and agrees that it shall and will, so far as it lawfully can at all times, during the existence of this lease, transact over the property hereby demised, all the freight and passenger business which it can control, destined to or through any point or points reached by the railroad lines hereby demised, when such lines can be utilized for such business; and that it shall not and will not during the existence of this lease without the consent of the lessor make any agreement, traffic contract, lease, or paper writing of any kind whatever, which shall in any way directly or indirectly evade in any particular the obligations hereof, or which shall permit any traffic of any kind that might produce a revenue to the lessor to be in any way diverted from the property hereby demised, or to be transacted by any other person or persons, corporation or corporations whatsoever."

In article twenty-one the lessee is required to keep separate books of accounts with respect to all business of the demised railways.

Article twenty-five provides for the payment of all expenses of management and operation out of earnings of the railways and other properties of the lessor.

Immediately after the execution of the said contract the plaintiff company turned over to the Soo company its railways, motive power, rolling stock and other equipment, and certain lands including a large acreage of land grant lands, and since that time the Soo company has been engaged in the active control and management of the plaintiff's properties under the name of the Chicago division of the Soo system. While the contract entered into between the plaintiff and the Soo company is denominated as a lease in the contract, and while the parties to the contract are designated therein as lessor and lessee, there is no stipulation for the payment of a definite rental to the plaintiff by the Soo system. The general provisions of the contract indicate that the arrangement between the two companies was more in the nature of an operating agreement than an ordinary lease. Under the various articles of the contract the Soo system agrees to efficiently manage, maintain, and operate the plaintiff's railway properties at the plaintiff's cost, and to account to the plaintiff for the net profits of the business.

The plaintiff was required by the terms of the contract to maintain its corporate existence and organization, and to "exercise each and every corporate act which it can now, or at any time hereafter may, lawfully exercise to enable the lessee to enjoy and avail itself of and exercise every right, franchise, and privilege hereby granted, and to · properly manage and operate the demised premises according to the terms of this lease."

The plaintiff has maintained its corporate existence and organization since entering into the contract with the Soo company for the operation of its properties, and has from time to time performed such corporate acts as were required and necessary to enable the Soo system to manage and operate the plaintiff's properties in accordance with the provisions and terms of the said agreement.

The sole question to be determined by the court is whether or not the corporate acts of the plaintiff in connection with the operation of its properties subsequent to the execution of its contract with the Soo company, particularly during the taxable year ending June 30, 1921, were of such nature and character as to constitute the "carrying on or doing business" within the meaning of section 1000 of the Revenue Act of 1918, c. 18, 40 Stat. 1057, 1126, which is as follows:

"(a) That on and after July 1, 1918, in lieu of the tax imposed by the first subdivision of section 407 of the Revenue Act of 1916—

"(1) Every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fair average value of its capital stock for the preceding year ending June 30 as is in excess of

$5,000. In estimating the value of capital stock the surplus and undivided profits shall be included; * * *

"(c) The taxes imposed by this section shall not apply in any year to any corporation which was not engaged in business (or in the case of a foreign corporation not engaged in business in the United States) during the preceding year ending June 30. * * *"

On May 17, 1920, the plaintiff's board of directors at a regular meeting passed resolutions authorizing the purchase of 12 locomotives for use on its lines, the funds for such locomotives to be advanced by the Soo company. Afterwards, on June 1, 1920, the plaintiff entered into an agreement with the Soo company whereby it agreed to reimburse it for the advances made for the purchase of the said locomotives.

On March 10, 1922, the plaintiff company again passed a resolution approving the purchase by the Soo company of the locomotives and other equipment for use on its lines during the years 1920 and 1921; and agreed to reimburse the Soo company for such equipment. The Soo company charged the account of the plaintiff with the sum of $636,825.79 for such equipment purchased during the period from March 1, 1920, to August 31, 1920, and the sum of $1,390,096.33 for such equipment purchased during the year 1921.

During the years 1920 and 1921, the plaintiff paid its notes in the amount of $355,964.85, $173,415.44, and $128,423.44, in payment for new railway equipment.

During the year ending June 30, 1920, the plaintiff received the sum of $168,597.79 from the sale of 11,260,045 acres of land grant lands, including a small number of town lots; and during the year ending June 30, 1921, the plaintiff received $80,776.46 from the sale of 5,375.65 acres of land grant land; and during the years ending June 30, 1920 and June 30, 1921, the plaintiff received upwards of $21,000 from the sale of land other than land grant lands.

Negotiations for the sale of the lands aforesaid were conducted by representatives of the Soo company, the deeds to the said properties being executed by the plaintiff except in cases where title to such lands was held in the name of the plaintiff's subsidiary companies, the Wisconsin Central Land Company and the Tri-State Land Company, in which case the deeds were executed by said companies.

At a meeting of its board of directors, March 9, 1920, the plaintiff's officers were authorized to execute an agreement providing for the joint operation by the plaintiff and the Chicago Milwaukee & St. Paul Railway of a line of railway extending from Eau Claire to Chippewa Falls, Wis., including certain trackage facilities, which agreement was later duly executed.

At a meeting held on September 9, 1920, plaintiff's board of directors approved the compliance with the regulations of the Department of the Interior respecting the filling of a certain bridge owned by plaintiff and by the execution of an agreement required by the Department of the Interior. Action was also taken approving the making of a quitclaim deed releasing the interest of the plaintiff in a certain alley to which it had title. Also approval was made of the sale of certain property owned by the plaintiff and no longer required for common carrier purposes, also a semiannual dividend was declared on preferred stock.

The plaintiff's board of directors at a meeting held on September 8, 1921, by formal resolutions authorized its president and vice president to issue to the Soo company six promissory notes aggregating the sum of $2,305,822.44 in payment of amounts due the Soo company for losses incurred in operating the plaintiff's properties during the period from September, 1920, to June 1, 1921, the said notes to be secured by the assignment and delivery to the Soo company of the plaintiff's first and refunding mortgage bonds, such notes, secured as aforesaid, to be used by the Soo company as collateral in securing additional funds necessary for the proper management, maintenance, and operation of the plaintiff company's properties. The delivery of the notes and securities authorized by the plaintiff company's board of directors was not consummated because of the refusal of the Interstate Commerce Commission to approve the same.

The plaintiff as before stated maintained its corporate existence at all times subsequent to the execution of its contract with the Soo company, held regular stockholders' and directors' meetings, elected corporate officers, declared and distributed dividends, and performed such acts in relation to the management and operation of its properties by the Soo company as it was required to do under the terms of the contract. The Commissioner of Internal Revenue determined and held that these acts, of the plaintiff in its corporate capacity, constituted "carrying on or do-

ing business" within the meaning of the statute, and levied and collected the taxes in question.

The question of what constitutes "carrying on or doing business" has been before the courts in numerous cases. The decided cases are uniform in holding that a capital stock tax is an excise laid upon the privilege of doing business in a corporate capacity. Washington Water Power Company v. United States, 56 Ct. Cl. 76; Flint v. Stone Tracy Company, 220 U. S. 107, 146, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312.

The rule is also well established that the amount of business transacted by a corporation alone is not determinative of whether or not such corporation is "carrying on or doing business."

In Von Baumbach v. Sargent Land Company, 242 U. S. 503, 517, 37 S. Ct. 201, 204, 61 L. Ed. 460, it is stated: " * * * the Act requires no particular amount of business in order to bring a company within its terms. * * * "

In Edwards, Collector v. Chile Copper Company, 270 U. S. 452, 46 S. Ct. 345, 346, 70 L. Ed. 678 it was held that where two corporations took part in carrying on one business they were each subject to the tax. The court said: "There was some suggestion that there was only one business and therefore ought to be only one tax. But if the one business could not be carried on without two corporations taking part in it, each must pay, by the plain words of the Act."

In Von Baumbach v. Sargent Land Company, supra, the court announced the following rule as a test for determining when a corporation is carrying on or doing business: "It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

The Chevrolet Motor Company v. United States, 64 Ct. Cl. 211, was a case where the plaintiff corporation, organized primarily for the purpose of manufacturing and selling automobiles, had, prior to the taxable periods in question, transferred all its assets and good will, exclusive of certain shares of common stock which it then owned in the General Motors Corporation, to that company and retired from the business of manufacturing and selling motor vehicles, this business of the plaintiff corporation being taken over and continued by the General Motors Corporation. While the Chevrolet Motor Company after the transfer of its assets and business to General Motors Corporation owned a majority of the stock of such corporation, it took no part in its corporate capacity in the management and control of the affairs and business of the General Motors Corporation. In passing upon the question of whether certain corporate activities of the Chevrolet Motor Company constituted doing business, this court said:

"Many close and doubtful cases have been before the courts, but where a manufacturing corporation, organized for profit and gain, continues after the disposition and sale of its good will and manufacturing assets to maintain its corporate entity and carry on with its remaining assets, engaging in business transactions inimical to the processes of final liquidation, all of which results in profit to its stockholders, it can hardly escape the classification of doing business. * * *

"If the plaintiff had done no more than receive and distribute dividends upon its General Motors stock to its shareholders and borrow funds to maintain and increase their value, the contention made for judgment in this case might be meritorious. But the findings disclose that it did a great deal more. While it discontinued to manufacture motor vehicles, it did not reduce its activities to a mere holding company. It continued a series of business transactions designed and intended to facilitate the successful conduct of the corporation in which it owned a controlling stock interest. * * *

"While plaintiff's officers drew no salary and it maintained no expensive organization and had reduced its overhead to the minimum, a fact accounted for in the transfer of the entire organization of the plaintiff to the General Motors Corporation on the date of sale, nevertheless it continued to function in a way that clearly demonstrates that what was done was not a mere passive, inert activity looking toward the liquidation of its assets or the usual activities of a holding company, but a lively participation in the activities of two other corporations linked with it, and whose success and profits redounded beneficially to the plaintiff. The

plaintiff loaned its corporate powers to other corporations, engaged in and becamè an important instrumentality in their business transactions. Surely this is carrying on business. If not, it is difficult to characterize it."

We believe the activities of the plaintiff in this case constituted the "carrying on or doing business" within the principles announced in the cases cited. During the taxable period in question the plaintiff purchased locomotive cars and other equipment for use in the operation of its railways; entered into obligations and agreements with respect to an additional right of way; executed conveyances to numerous parcels of real estate owned by it; issued its promissory notes for sums of money; entered into a contract or lease for the operation of another line of railroad for use in the operation of its properties; kept its corporate organization intact; elected corporate officials from time to time, and declared and distributed dividends among its stockholders.

These activities on the part of the plaintiff were all necessary acts to enable the Soo company to maintain and operate the plaintiff's railway properties in accordance with the terms and provisions of the lease or agreement entered into by and between plaintiff and the Soo company. These activities were not, in our opinion, merely incidental to the operation of the plaintiff's railway properties by the Soo company but were essential and necessary acts in the operation of the properties. They were acts that could not have been performed by the Soo company, acting in its own name.

While the Soo company under its contract with the plaintiff had the active control and management of the plaintiff's properties, and while the corporate activities of the plaintiff company before stated were performed on the orders and by the direction of the Soo company, they were nevertheless the acts of the plaintiff company in its own corporate capacity.

The plaintiff had obligated itself in article 4 of the contract to "maintain its corporate existence and organization, * * * and exercise each and every corporate act which it can now or at any time hereafter may lawfully exercise to enable the lessee to enjoy and avail itself of and exercise every right * * * to properly manage and operate the demised premises according to the terms of this lease. * * *"

The corporate activities of the plaintiff were in strict accord with the terms of the contract, and while such activities were not numerous, and were perhaps not of major importance, they were nevertheless required for the proper management and operation of the plaintiff's properties by the Soo company.

These facts bring the plaintiff company within the rule announced in Edwards, Collector v. Chile Copper Company, supra, that, where a business cannot be carried on without two corporations taking part in it, they are each liable for the tax.

The plaintiff was engaged in the "carrying on or doing business" within the meaning of the taxing statute, and the Commissioner of Internal Revenue properly and legally assessed and collected the taxes in question.

Plaintiff's petition is accordingly dismissed. It is so ordered.