## MAHONING COAL R. CO. v. HIGGINS, Collector of Internal Revenue.

District Court, S. D. New York.

Feb. 25, 1943.

Clive C. Handy, of New York ·City (Crosby J. Beakes, Clive C. Handy, and Leo Manville, all of ·New York City, of counsel), for plaintiff.

· Mathias F. ·Correa, U. S. Atty., of New York· City (Arnold C. Stream, Asst. U. S. Atty., of New York City, of counsel), for defendant.

LEIBELL, District Judge.

This is an action to recover the amount of federal capital stock taxes paid under protest· by the plaintiff for the tax years ending June 30, 1937, June· 30, 1938 and June 30, 1939, in the respective sums of $18,627.67, $19,240.17 and $18,337.49, including interest. The declared value of plaintiff's capital stock was $17,500,000, for 1937 and 1938, and $17,727,877.88 for 1939. The tax was 1%.

In its returns the plaintiff claimed exemption from the tax on the ground that it was not carrying on or doing business during the tax years in question. The Commissioner denied the exemption, assessed the tax, and denied plaintiff's claims for refunds. Under the applicable statutes (Revenue Act of 1935, Section 105, as amended by Section 401 of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 943; Revenue Act of 1938, Section 601, 26 U.S.C.A.Int.Rev.Acts, page 1139 et seq.; and Internal Revenue Code, Section· 1200, 26 U.S.C.A.Int.Rev.Code, § 1200), a capital stock tax was imposed on every domestic corporation "with respect to carrying on or doing business for any part" of the year ending June 30th.

The sole issue is whether plaintiff "was carrying on or doing business," within the meaning of said statute, at any time during the tax years in question. Upon this issue, the decision in each case must depend on 'its own particular facts. Von Baumbach v. Sargent Land Co., 242 U.S. 503, 516, 37 S.Ct. 201, 61 L.Ed. 460. Accordingly, the plaintiff's corporate purposes and organization and the scope of its functions will first be examined.

Plaintiff was organized on February 25, 1871 under the laws of the State of Ohio for the purpose·of constructing a railroad between certain points specified in the certificate of incorporation, which was filed pursuant to a statute (Laws of Ohio, Act of May 1, 1852, 50 Ohio Laws, p. 274) providing for the organization of a railroad corporation. By complying with the terms of the statute plaintiff received the powers and status of a railroad corporation.

In and prior to 1873, plaintiff constructed a line between Youngstown and Andover, Ohio, a distance of 38 miles, and in 1903 a branch line was built from Brookfield to Mann, Ohio, a distance of 24 miles. On December 4, 1871, prior to the completion of the original line, plaintiff entered into an agreement with The Lake Shore and Michigan Southern Ry. Co. (a corporate predecessor of The New York Central R. R. Co.) providing for the prospective handling of traffic over plaintiff's line in connection with a branch of the Lake Shore railroad. In 1873, after completion of plaintiff's original line, plaintiff was without equipment to operate it and made an agreement with the Lake Shore by the terms of which possession of plaintiff's line was transferred to the· Lake Shore to be managed and operated by the latter for twenty-five years. The plaintiff's investment is entirely ·in road property. Plaintiff and its subsidiaries never owned any locomotives, cars or similar equipment.

In July, 1884, a superseding agreement was made between plaintiff and the Lake Shore railroad giving the latter perpetual possession and right to maintain, work and operate the Mahoning Line in all respects as if Lake Shore were the owner. On its part Lake Shore promised, in addition to the payment of taxes on the· property, to pay to plaintiff forty per cent of the gross

earnings of the line and at least such sum (part of it, if necessary, by way of advances bearing interest) as shall be required to pay the interest on plaintiff's bonded indebtedness, dividends on its preferred stock and the cost of maintaining plaintiff's corporate organization. Paragraph 6 of the 1884 agreement is as follows:

"6. That it will divide and share with said Mahoning Company the gross earnings of said road whilst operated hereunder, in the proportion of forty per cent. of said earnings to said Mahoning Company, and sixty per cent. to be retained by it, said Lake Shore Company; and that said Mahoning Company's said forty per cent. shall be sufficient every six months to pay the current half year's interest per annum on said Mahoning Company's issue of one million, five hundred thousand dollars of bonds hereinbefore mentioned, and upon any bonds that may be issued at request of it, said Lake Shore Company, to provide for retirement of said issue or any subsequent issue of bonds, at maturity, and the current half year's dividend of two and one-half per cent. upon any preferred stock of said Company, not, however, to exceed four hundred thousand dollars in amount, issued and outstanding; and also the cost not to exceed one thousand dollars per annum of maintaining the corporate organization of said Mahoning Company; and that in case said earnings are at any time insufficient in that behalf, it, the said Lake Shore Company, will advance the money needed to make good the deficiency, provided, however, that in case it, said Lake Shore Company, shall at any time be required under this covenant to make and shall make any advance of money, the money so advanced shall remain a charge upon any future earnings to which said Mahoning Company shall become entitled over and above the amount required to pay such interest and dividends and cost of maintaining the organization of said Company, and may be retained by said Lake Shore Company therefrom, with interest at the rate of six per cent. per annum: Provided, that any such advances by said Lake Shore Company shall be a charge against such earnings only of said Mahoning Company, and shall not be otherwise a charge against said Company, or a lien upon its property."

In October 1889, a supplementary indenture was entered into which contained similar provisions with respect to other roads of which plaintiff had become the sole stockholder, the Shenango Valley Railroad Co., Mahoning and Shenango Valley Railway Company and Stewart Railroad Company. The agreement of 1884, as supplemented in 1889, remained in full force and effect through the tax years involved in this suit. In 1923 the New York Central succeeded the Lake Shore in the possession and operation of plaintiff's rail line. At all times since 1917 plaintiff has owned one-half of the capital stock of The Lake Erie and Eastern Railroad Company, the other half being owned by The Pittsburgh and Lake Erie Railroad Company. During the tax years in question the New York Central Railroad owned 18,532 shares of plaintiff's 30,000 shares of common stock outstanding, and 10,453 shares of the 13,227 shares of preferred stock.

There is a controversy as to the proper construction to be given these indentures, the plaintiff contending that in legal effect they are leases while the Government considers them joint operating agreements. If they are joint operating agreements, there would be an end to this suit, since plaintiff would then be engaged in business. This question of construction will be deferred until the statement of facts has been completed.

During the tax years involved in this suit, plaintiff had no employees and no payroll of its own. The plaintiff's officers and five of its seven directors had similar positions with the New York Central or one of its affiliates. In each of the years involved in this suit, plaintiff contributed $5,000 to the salaries and expenses of the general offices of the New York Central Railroad for handling the Mahoning's accounts, funds, transfers of stock and records. Plaintiff's accounts and records were kept and transfers of the stock were made in the New York Central offices. Officers and directors of plaintiff received no compensation for their services, except that directors' fees and expenses were paid in amounts ranging between $700 and $1,000 in the tax years in question.

During these years plaintiff's directors held quarterly meetings, declared dividends and elected officers and directors. Dividends were paid from the rental received from the New York Central under the provisions of the agreements referred to above, and also from dividends received on the stock which plaintiff owns in The Lake Erie and Eastern Railroad Company, one-half of

whose capital stock was acquired by plaintiff in 1917. This stock has been regularly voted by plaintiff at stockholders' meetings. In the tax year ending June 30, 1937, the sum received by plaintiff from New York Central pursuant to its agreement was $1,568,292.62; for the 1938 tax year it was $1,279,151; for 1939, $998,254.97. During said years dividends received by plaintiff from The Lake Erie and Eastern averaged about $83,000.

By an agreement made October, 1889, plaintiff acquired the right in perpetuity to possess, maintain and operate the railroads owned by the Shenango Valley Railroad Company, The Mahoning and Shenango Valley Railway Company and The Stewart Railroad Company, plaintiff's wholly owned subsidiaries. These roads are now operated by New York Central under the supplemental indenture of October 1, 1889, hereinabove referred to, between plaintiff and the Lake Shore Co. No dividends have been paid on this stock but the plaintiff has regularly voted the same at stockholders' meetings. Plaintiff has also received presumably its forty per cent of the gross earnings of those roads under an arrangement similar to that set forth in paragraph "6" above quoted. Plaintiff's branch line to Mann, Ohio, built in 1903, is covered by the July 1, 1884 agreement.

Plaintiff never had any equipment or rolling stock of its own. Improvements and new acquisitions are made by Central at its own expense. Additions, extensions, or new and substantial improvements for an increase or enlargement of railroad facilities may be made by Central with the approval of two-thirds of plaintiff's stockholders at the expense of Mahoning. There were no such expenditures during the tax years in question.

On July 1, 1934, the bonded indebtedness of plaintiff which matured on that day was paid off, partly with funds borrowed by plaintiff on open account at 4% from the Canada Southern Railway Company in the sum of $750,000 and from Northern Refrigerator Line, Inc., in the sum of $350,000, subsidiaries of the New York Central. From time to time thereafter plaintiff, in addition to paying current interest, made payments in reduction of these loans until they were fully paid on July 30, 1940. In 1937, said payments amounted to $250,000; in 1938 and 1939 to $75,000 each year.

In December 1937 the directors authorized the conveyance of an easement to the City of Youngstown for a viaduct right of way over plaintiff's property, pursuant to the request of the New York Central. The minutes recite that the award from the City (in a condemnation proceeding presumably) was expected to be about $10,000. In March 1938 and in June of the same year the directors, with the consent of the New York Central, authorized conveyances of several parcels of land, part of an old abandoned railroad right of way, for considerations of $300 and $100 respectively.

In determining whether the plaintiff "was carrying on or doing business" during the tax period, plaintiff's activities must be viewed as a whole. Edwards v. Chile Copper Co., 270 U.S. 452, 456, 46 S. Ct. 345, 70 L.Ed. 678. "Business" has been broadly defined as "that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit" (Flint v. Stone Tracy Company, 220 U.S. 107, 171, 31 S.Ct. 342, 357, 55 L.Ed. 389, Ann.Cas. 1912B, 1312) and the problem must be approached with an eye to the presumption that a corporation organized for profit is engaged in business. Art. 73, Treasury Regulations 64 (1936 Ed.); Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460; United States v. Peabody Co., 6 Cir., 104 F.2d 267. As the Supreme Court said in Edwards v. Chile Copper Co., 270 U.S. 452, at page 455, 46 S.Ct. 345, at page 346, 70 L.Ed. 678: "The cases must be exceptional, when such activities of such corporations do not amount to doing business in the sense of the statutes." But the facts in the present case appear to be not unusual where a railroad corporation is concerned. McCoach v. Minehill & S. H. R. Co., 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842; Nashua & L. R. Corporation v. Welch, D.C., 33 F.Supp. 684, affirmed 1 Cir., 115 F.2d 920, and cases cited in Carolina, C. & O. Ry. v. Higgins, D.C., 21 F.Supp. 262.

The government's contention that the agreements relating to the possession and operation of plaintiff's railroad properties are joint operating agreements must first be considered. In my opinion, the plaintiff is right in its contention that these agreements are in effect leases in perpetuity and that plaintiff's relation to New York Central in respect thereto is that of landlord and tenant and that plaintiff's income thereunder is rent. By the terms of the agreement of July 1, 1884, the Lake Shore

was given full possession of plaintiff's road with right and authority to maintain, work and operate the road (Exh. 1, p. 1). The Lake Shore covenanted to maintain, work and operate the road "in all respects in like manner as it would be bound to do, and would do, were it the owner thereof" (Exh. 11, p. 2), and to maintain the road in good condition and to surrender the premises in as good a condition as when received from plaintiff, if its right of possession should for any reason terminate (Exh. 11, p. 3). Lake Shore agreed to pay all taxes and assessments on the roads or property, or upon the said Mahoning Company by reason of its interest therein, and to pay Mahoning forty per cent of gross earnings as hereinabove set forth. The supplemental indenture of 1889 contained similar provisions.

The Government here, as did the Commissioner in his letters of July 12, 1939, and December 20, 1940, rejecting plaintiff's claims for refunds, leans heavily upon the above-quoted paragraph "6" as supporting the contention that the agreements with Lake Shore were agreements for the joint operation of the road, because the rental is not a fixed lump sum. But it is clear that the provision for sharing in gross earnings is merely a yardstick for measuring each year the amount of a variable rental. That is not an exceptional provision, even in leases of real estate for store purposes. Plaintiff is not sharing in net profits. Here, plaintiff would be entitled to its fixed percentage of gross earnings even though Lake Shore (or New York Central) suffered a net loss from its operation during the year. The above quoted provision also provides for a basic minimum annual payment which shall be made to plaintiff, even if the forty per cent of gross earnings should amount to less than said minimum.

In Wisconsin Central R. Co. v. United States, 41 F.2d 870, 70 Ct.Cl. 203, certiorari denied 283 U.S. 829, 51 S.Ct. 353, 75 L.Ed. 1442, the lessee paid dividends to the lessor's stockholders out of net earnings. Furthermore, the activities of the Wisconsin Central, as outlined on page 884 of 41 F.2d, were far more extensive than those of the plaintiff. Especially significant are the purchases of locomotives made by Wisconsin Central for the operation of the road. Discussing the contract under which the Soo Line operated the road, the court said (41 F.2d at page 883):

"The general provisions of the contract indicate that the arrangement between the two companies was more in the nature of an operating agreement than an ordinary lease. Under the various articles of the contract the Soo system agrees to efficiently manage, maintain, and operate the plaintiff's railway properties at the plaintiff's cost, and to account to the plaintiff for the net profits of the business."

It is apparent that the Court regarded the Soo Line as the operating agent of the Wisconsin Central. This becomes clearer in the light of the action of the Wisconsin's board of directors on September 8, 1921, in authorizing the issuance to the Soo Company of promissory notes in excess of $2,-000,000 "in payment of amounts due the Soo company for losses incurred in operating the plaintiff's properties during the period from September, 1920 to June 1, 1921." 41 F.2d 884. Apparently, the losses as well as the profits were Wisconsin's, and therefore the Soo, the so-called "lessee," was in reality only an operating agent. In that view the court properly held that the Wisconsin Central Railway was carrying on business.

The agreements between plaintiff and Lake Shore did not give plaintiff any right to take part in the operation or management of the road. As the court said in McCoach v. Continental Passenger R. Co., 3 Cir., 233 F. 976, at page 979:

"We discern no difference between an operating agreement of this kind and the customary lease by which one railway corporation takes over and operates the property of another, when considered with regard to carrying on business with that property. By such an agreement, one corporation surrenders and the other assumes and exercises control over the property and its operation, as fully and as completely as though the transfer had been effected by the recognized method of a lease."

The next question to be considered is whether a corporation which has leased all its properties and receives the rentals therefor may be held to be "carrying on or doing business." McCoach v. Minehill & S. H. R. Co., 228 U.S. 295, at page 306, 33 S.Ct. 419, at page 424, 57 L.Ed. 842, answered the question in the negative, saying:

"In our opinion the mere receipt of income from the property leased (the property being used in business by the lessee, and not by the lessor) and the receipt of interest and dividends from invested funds, bank balances, and the like, and the distri-

bution thereof among the stockholders of the Minehill Company; amount to no more than receiving the ordinary fruits that arise from the ownership of property."

In the McCoach case the court refused to accept the Government's argument (similar to its contention in the instant case) that the maintenance of the taxpayer's corporate existence and organization and its readiness to repossess the leased property in the event of a termination of the lease, required that the corporation be treated as engaging in business. 228 U.S. at page 305, 33 S.Ct. 419, 57 L.Ed. 842. See, also, Carolina, C. & O. Ry. v. Higgins, D.C., 21 F. Supp. 262.

The Treasury Department, in its letter of March 18, 1940, rejecting the Mahoning Company's claim to exemption from the capital stock tax, stated:

"An operating agreement providing for a fluctuating rental measured by the successful operations or favorable volume of business of the operating company is not such a long-term lease as would retire a lessor corporation from pursuit of profit and gain to the extent that it can be regarded as not engaged in business. It does not appear that your corporation ever operated its railroad properties nor that it has retired from any other purposes or business for which it was organized."

Evidently the Government takes the position that where the rental depends on the gross earnings of the tenant, the lessor is in effect engaged in business together with the lessee. Every landlord is to that extent in business with his lessee, because if the lessee does not conduct a profitable business the rent is not likely to be paid. Indeed, a large fixed sum as a rental might be more of a burden on a lessee than a rental based upon a percentage of gross earnings. A wise landlord would hope to have a successful tenant. If that constitutes the pursuit of profit and gain, then no corporate lessor can escape the tax. It should be reiterated that plaintiff's rental did not depend on the lessee's net profits, and that a fixed minimum income was assured plaintiff, in a manner similar to the provisions in the Minehill Company lease. There the lease was for 999 years at a yearly rental of $252,612, the equivalent of 6% on the capital stock of the Minehill Company.

Plaintiff was authorized and empowered by the provisions of the statute under which plaintiff was incorporated on February 25, 1871, not only to construct a railroad but also to operate it. Laws of Ohio, Act of May 1, 1852, 50 O.L. p. 274. Plaintiff's main line was completed on or about May 1, 1873, and possession thereof was, on that day, transferred to the Lake Shore Co. to be managed and operated for a period of twenty-five years. The Government is correct in stating that plaintiff never operated its railroad properties. That is one of its powers which plaintiff by its acts relinquished as soon as the road was completed. From the business of operating a railroad the plaintiff actually retired when it made the twenty-five year lease, and the later 1884 and 1889 leases in perpetuity.

Under the authorities, if the activities of plaintiff were confined to owning its leased line, receiving rentals therefor and distributing them to stockholders, plaintiff would clearly be entitled to judgment. See, Art. 43 (b) (2) of Treasury Regulations 64. However, the Government directs attention to certain other activities during the tax years in question, which will now be examined.

■ As heretofore stated, plaintiff during the tax years made payments on the principal of open account loans, made to it in July 1934 to meet its fifty-year mortgage bonds which then fell due. In McCoach v. Continental Passenger R. Co., 3 Cir., 233 F. 976, it was held that a corporation did not become engaged in business merely by reducing its indebtedness through a sinking fund or by reducing its bonded indebtedness. See, also, New York Central & H. R. R. Co. v. Gill, 1 Cir., 219 F. 184, and Anderson v. Morris & E. R. Co., 2 Cir., 216 F. 83. What plaintiff did in substance was to refinance its bonded indebtedness and provide appropriately for the discharge of the new debt. Within the decided cases, this activity should not be considered as the doing of business.

■ The plaintiff owned stock in four other railroad corporations. From one, The Lake Erie and Eastern Railroad Company, plaintiff has received dividends for many years; from three others, nothing by way of dividends. These stock holdings appear to have been a permanent investment of many years standing and to have a direct relationship to the property leased to the New York Central. Mere ownership of property or of investments does not subject a corporation to the capital stock tax.

■ Plaintiff's board of directors authorized the making of three conveyances of

real estate, all part of an old abandoned right of way: 1.2 acres to the owner of adjoining property for $300, and two small parcels to Ohio Edison Co. for $100. The acts were "exceptional in nature and trifling in amount." Traction Cos. v. Collectors, 6 Cir., 223 F. 984, 989. At the request of the New York Central during the same tax year ending June 30, 1938, the board also authorized the conveyance to the City of Youngstown of an easement for a viaduct over plaintiff's roadbed. This action was taken in connection with a condemnation proceeding by the City and is therefore devoid of significance on the question of whether plaintiff was engaged in business. The proceeding was "in invitum."

The Government has placed some emphasis on the fact that the plaintiff's profit and loss balance increased during the tax years in question and that the surplus account also increased. But relatively speaking, the increase was slight and is accounted for in large measure by the use of part of the rental income to pay off the open account indebtedness contracted in 1934.

■ The larger question must now be considered, namely, whether the activities of the plaintiff when viewed, not separately as has been done thus far, but as a whole, call for a determination that the plaintiff is engaged in business. It is true that often the composite may have more significance than all its separate parts, but if, as here, all parts are consistent with mere ownership of property, the property owner does not become an active business organization. It will be borne in mind that the capital stock tax is not a tax imposed upon the ownership of property but is an excise levied upon the privilege of engaging in business. Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann. Cas.1912B, 1312. There has been no change in the properties and stock investments of this plaintiff since 1907. It has had the one tenant (or the legal successor thereto) for its railroad properties at all times. It does not own any rolling stock whatsoever and never did. It never operated the railroad. It has not in over twenty years sought to extend its sources of income or made any efforts in pursuit of profit or gain.

"The crucial words of the statute, 'carrying on or doing business,' are not so easy of application to varying facts that they leave no room for administrative interpretation or elucidation." Magruder v. Washington, B. & A. Realty Corp., 316 U.S. 69, 73, 62 S.Ct. 922, 924, 86 L.Ed. 1278. Hence we have Treasury Regulations to aid us in applying the statute to various factual situations. Some of these Regulations follow closely the language of decided cases.

■ The plaintiff corporation, for many years, has limited its activities to "the mere owning and holding of specific property" and "the distribution of the avails of property and the doing only of such acts as may be necessary for the maintenance of its corporate status." Article 43 (b) (2) of Treasury Regulation 64; Von Baumbach v. Sargent Land Co., 242 U.S. 503, 516, 37 S.Ct. 201, 61 L.Ed. 460. Plaintiff falls within one of the recognized exceptions to the "doing business" provision of the statute and was not subject to the capital stock tax for the tax years in question.

In Von Baumbach v. Sargent Land Co., 242 U.S. 503, at page 516, 37 S.Ct. 201, at page 204, 61 L.Ed. 460, the court said:

"It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

In the present state of the authorities, it is my opinion that the plaintiff should be included in the first of the classes mentioned by the court in the above quoted excerpt from the Von Baumbach case. I know that the tendency of decisions is away from granting any exemption from the capital stock tax. American Investment Securities Co. v. United States, 1 Cir., 112 F.2d 231, 234. Even though my own views are in sympathy with the modern trend to narrow the exemptions from the capital stock tax, I must apply the law as interpreted by our last court of appeals. It seems to me that the case at bar is very similar to the McCoach case, supra, which has not as yet been disapproved and is binding on this.

court.   Sears v. Hassett, 1 Cir., 111 F.2d 961, 965;  North Pennsylvania R. Co. v. Rothensies, D.C., 45 F.Supp. 486, 497.

I have made findings of fact and conclusions of law, which are being filed together with this opinion.

Judgment for the plaintiff.