## 233–5 WEST 125TH STREET CORPORATION v. HOEY.

District Court, S. D. New York.
March 25, 1947.

Engel, Judge & Miller, of New York City (Robert Sterling and Lester W. Rubin, both of New York City, of counsel), for plaintiff.

John F. X. McGohey, U. S. Atty., of New York City (Henry L. Glenn, Asst. U. S. Atty., of New York City, of counsel), for defendant.

CLANCY, District Judge.

Plaintiff was organized on April 12, 1916. The purposes stated in its charter were generally improving, managing and dealing in real estate. The first meeting of the incorporators occurred on April 19, 1916. The following day it leased for twenty years a parcel of land to which it had already acquired title and a theatre which it agreed to erect thereon. Some time before 1928 it owned an apartment house which was sold in that year. Other than that apartment house it has never owned any but the theatre property.

A new lease for fifteen years was negotiated and executed in September, 1936. The tenant therein was a different corporation owned by the same interest as was the original tenant. The rental stated in this 1936 lease like the rent in the original was a graduated percentage of the tenant's gross receipts which included admissions, candy sales, concessions and rent from subleases. If any sublease was of an associate, subsidiary or affiliate of the tenant its gross receipts, to be not less than the gross rents paid by it, were included in the computation in lieu of its rent. If, during the term of the lease, the character of the entertainment changed, a deduction of the cost incurred by the entertainment was to be allowed. The lease guaranteed a minimum rent payable in monthly installments in advance together with the taxes and fire, rent and liability insurance premiums. To calculate rent the lease year commenced on October 1st. The year was then divided into four periods of thirteen weeks each and the tenant was required within fifteen days after the termination of each of such quarterly periods to furnish to the landlord a written statement showing the gross receipts from the first day of October last preceding to the end of the last quarterly period. For such last preceding quarterly period the daily gross receipts were required to be shown. Plaintiff regularly received and examined these reports—its accountant and officers together examined and considered them. The lease then provided that the rent arrived at by applying the percentages stated in the lease to the gross receipts shown in the statement was to be deemed the tentative rent for the period accounted for. Any amount then tentatively appearing due over the aggregate payments theretofore made was to be paid with the delivery of the statement; the

landlord on the contrary was to credit any excess payment over such tentative rent upon the next payment due from the tenant. Thus—and this was explicitly provided—a tentative adjustment was to be made within fifteen days after the end of each quarterly period and on or before each October 15th, there was to be a final adjustment of the rent for the preceding year. Taxes, although to be paid by the tenant, were to be accrued tentatively on the basis of the prior year's taxes, subject to appropriate adjustment when they had been fixed. They were actually paid by the tenant direct to the taxing authority apparently without any such accrual or advance payment and therefore without adjustment and this usage may have modified the duty of the landlord heretofore stated to credit any excess payment to the amount due in the following quarter. Tenant's books of account, records, documents and papers relating to its operation of the theatre were to be retained two years after the quarter to which they applied and were to be always open to the landlord's inspection. The landlord had the right at any time to have an audit of the tenant's business for any period during the term of the lease and provision was made for the appointment of a certified public accountant as an umpire if disagreement ensued as to any facts or factors material to the determination of the rent. The umpire's findings would be conclusive and any rent found due by him different from the amounts theretofore paid, was to be paid then or "vice versa" which we take it, means that the landlord was to pay any excess it had theretofore collected. To secure its interest in the care and maintenance of the furnishings and equipment as well as in the building, the tenant agreed to admit the landlord at any time during the term for purpose of inspection. The landlord reserved the right to terminate the lease on the tenant's failure to cure any default in its covenants within ten days after notice thereof. The usual provisions for dispossess or reletting were incorporated in the instrument. The security on this lease was $50,000, which was paid. Three and one-half per cent was exacted on this security but the landlord was given the option to invest it in the bonds of the United States or of the City or State of New York and to pay the income therefrom to the tenant. To secure its repayment the tenant was given a lien on the demised premises which could be discharged upon deposit of the security in a bank. Such deposit would relieve the landlord of the interest payments. During the taxable year the landlord paid interest to the tenant on this security. During the years 1937 and 1938 more rent than the guaranteed minimum accrued and was paid in accordance with the clauses we have stated. The landlord's right to inspect the tenant's books and records has been exercised but once since 1930 and then in a superficial fashion, the tenant having at all times been deemed by the landlord substantial and reliable. Plaintiff's accountant however dealt with tenant's accounting department which, undefined, must mean that the accounting was strict and its rights never forgotten.

All of the plaintiff's stock is owned by the A. B. S. Corporation which owns also all of the stock of the Brisbane Finance Corporation and the Judicious Holding Corporation. The stock of the A. B. S. Corporation is held by a trustee. The trustee of another trust owns all of the stock of the New Jersey General Corporation. Beneficiaries of both trusts were members of one family and through other trusts owned and wholly controlled the stock in at least four other corporations. All of these companies were solvent business corporations organized for profit and, excepting the finance corporation, had substantial assets in the form of real estate. The money of all eight of these corporations was deposited in a bank in a Brisbane Finance Corporation general account. In the case of the plaintiff this was according to a directors' resolution and the Brisbane Finance Corporation collected its rent as its agent. Originally checks on this account could be drawn by the president who was probably and the secretary who it was testified was in fact the same officer in each of the other corporations. In one clause of the resolution this plaintiff exonerates the depositary from liability for honoring any checks so drawn even to the individual officer without questioning its use or pur-

pose. A set of books was kept for both the plaintiff and the Brisbane Finance Corporation and probably for the others; certainly for the New Jersey General Corporation. Receipts of plaintiff's rents and disbursements were set up as charges and credits on the finance corporation's books and corresponding credits and debits entered on the books of the plaintiff. The difference between plaintiff's income and disbursements for its account was intermittently or at all events annually entered on its books as an account receivable from the finance corporation. But the book entries of all were by no means simple nor confined to showing receipt of actual income and disbursements. Thus in January, 1938, New Jersey General Corporation had been debited to the finance corporation in a sum exceeding $64,000. Plaintiff held an account receivable from the Brisbane Finance Corporation in the sum of $64,-441.85 which was cancelled. A note was delivered by the New Jersey General Corporation to the plaintiff or a credit entry was made in the plaintiff's books indicating the receipt of a receivable in the sum of $64,936.49. The finance corporation credited on its books satisfaction of the debt to it of the New Jersey General Corporation. The result was that the plaintiff was charged with an additional debit of $494.-64. The explanation was that it was desired by those in control of all the corporations that the debt of New Jersey General Corporation to the plaintiff would be in round figures. If the action of plaintiff's officers is given the proper effect, Finance Corporation was paid with plaintiff's account receivable due from Finance and plaintiff borrowed $494.64 more. In another case a charge was dismissed to the extent that it took up an equal amount of the debt of a third corporation to the finance corporation, such debt being a disbursement for office expenses and attorneys' charges for all the corporations which were paid by one other than the finance corporation. The attorneys' fees thus charged to the plaintiff were not unsubstantial and no satisfactory accounting was made for the charge which appeared to have been an arbitrary allocation to this plaintiff of part of a general charge for both retainer and fees for servicing of all the corporations and maybe the trusts that own them.

Both depreciation account and accrued surplus consisted of accounts and bills receivable represented by both entries on the books of the plaintiff and the finance corporation or the New Jersey General Corporation or notes of the latter. In 1936 a dividend of $27,000 was paid by the plaintiff, in 1937 a dividend of $18,500 and in 1938 a dividend of $19,500. These were all paid by the plaintiff's interest bearing note and interest was actually charged to the plaintiff on its books as it accrued on these alleged dividends. Interest also accrued on its accounts receivable and was entered as a credit as it accrued. Other than its real property and the credits in its favor on the books of the finance corporation and some of the other corporations or the New Jersey General note, the plaintiff had no assets. It had no separate office. It paid, as we have indicated, a proportionate share of the expenses of maintaining an office for the organization which embraced all the trusts and the corporations to which we have referred. Another of the corporations reported the salaries of all the organization's employees as its own for their security and unemployment benefits. Plaintiff's officers were not compensated as such. During the taxable year no stockholders' meetings were held; one directors' meeting was held on December 29, 1937.

In July, 1938, plaintiff filed with the defendant's testator, then the Collector of Internal Revenue for the Second District of New York, its capital stock tax return for the year ending June 30, 1938, claiming therein its exemption from the tax on the asserted ground that it did not do business during the taxable year. The exemption was denied and a tax assessed which was paid to defendant's testator on September 5, 1939. A claim for refund was filed on or about July 28, 1941. This claim was rejected by the Commissioner on September 24, 1941, on the following grounds: "Inasmuch as your corporation has not leased its property under a long-term lease at a fixed rental, and since it appears that it is making informal loans to its parent and affili-

ated company instead of disbursing the net income as dividends to its stockholders it does not appear that your corporation is entitled to exemption."

Article 42 of Regulations 64, 1938 Edition, says that "no particular amount of business need be done nor is it necessary for the business to be continuous throughout the taxable year." The case is exceptional in which the activities of a corporation organized for profit do not amount to doing business within the meaning of the act. Edwards v. Chile Copper Co., 270 U.S. 452, 46 S.Ct. 345, 70 L.Ed. 678. Article 43, (a) 4, says that a corporation is in business which is financing, performing any function, or in any other way aiding or serving the general purposes of any affiliated or related company and Article 43, (b) 1, says a corporation is not subject to the tax if it has reduced its activities to the mere owning and holding of property, to distribution of its avails and doing only such acts as are necessary to the maintenance of its corporate existence, but is subject to a tax if nevertheless it engages in other business activities or maintains its organization for the purpose of continued effort in the pursuit of profit or gain.

In McCoach v. Minehill R. Co., 228 U.S. 295, 33 S.Ct. 419, 424, 57 L.Ed. 842, the Court observed that the Minehill R. Co. possessed personal assets in the form of investments and then said: "The receipt of interest and dividends from invested funds, bank balances, and the like, and the distribution thereof among the stockholders * * * amount to no more than receiving the ordinary fruits that arise from the ownership of property." In Magruder v. Realty Corporation, 316 U.S. 69, 62 S.Ct. 922, 86 L.Ed. 1278, the Court pointed to the Regulations as appropriate aids toward eliminating confusion and uncertainty. Article 43 of the 1938 Regulations says that "doing business" includes engaging in: "(a) 6 Investment or reinvestment (in the case of a corporation holding securities) of surplus or other funds in additional securities with the exception of the reinvestment of funds realized upon the maturity or redemption of securities." If regard be had for these regulations then plaintiff is doing business. The form in which this plaintiff has fixed its personalty is not an investment in the sense of that word intended in the regulation. Whether the so-called bills receivable are more than book entries we do not know. The note of New Jersey General Corporation held by this plaintiff, so far as we know is an ordinary I.O.U. If it has a due date that fact has not been proved. Plaintiff has no security for its payment and cannot collect it without either corporate action of the New Jersey General Corporation or a lawsuit because there is no market for the note— none has been proved nor is its existence an assumable fact. We would call this disposition of plaintiff's reserve and surplus a speculation or at best a so-called business man's investment, depending wholly on the success of the debtor corporation and demanding continued interest in its affairs. Owning it is a business activity within the sense of the statute. The only investment of accruing funds permitted an exempt corporation is in securities whose value depends on public knowledge, interest and support. See Argonaut Consol. Mining Co. v. Anderson, 2 Cir., 52 F.2d 55. Plaintiff says the Brisbane Finance Corporation is its bank. There is no evidence in this case that the assets of the finance corporation are liquid or the general account large. Its funds are not available on the demand of the plaintiff. To consider it plaintiff's bank is to accomplish a feat of the imagination. The fact is that the plaintiff made its funds available to the Brisbane Finance Corporation for the use of that corporation and that annually an account was stated and the plaintiff credited to itself whatever debt from the finance corporation appeared in its favor for any undisbursed balance of its income. This is doing business without considering the relationships of the corporations referred to in our findings that borrowed from the finance corporation. If they be taken into consideration plaintiff's operations are "doing business" within the letter of Article 43, (a) 4 of the Regulations which we have earlier quoted. Phillips v. International Salt Co., 274 U.S. 718, 47 S.Ct. 589, 71 L.Ed. 1323; New Haven Sec. Co. v. Bitgood, 2 Cir., 87 F.2d 759; New London Northern R. Co. v. Smith, 2 Cir., 141 F.2d 219. Just what pur-

poses of those corporations were served with plaintiff's income we do not know. On the trial we sustained the plaintiff's objection to the defendant's search for this information which of course should have been supplied by the plaintiff itself as part of its case if the use of the borrowed fund had any other than a business purpose, but it did appear that all such associated companies were in business and for profit and that is enough to support a finding that their use of the borrowed money brought plaintiff within the terms of the cited regulation. Plaintiff's funds were supplying the need or the wish or the means of some operation or other of one or more of such associated companies and the sole purpose sought in its management was to serve whatever interest one or more of such other companies was pursuing. We notice the identity of the officers of the plaintiff and of the finance corporation and of the other corporations but whether or not plaintiff was doing business must be judged by what they did as its officers. Everything we have said is especially true of the $50,000 security loaned to the finance corporation and standing as a receivable from that corporation on plaintiff's books. This was retained by plaintiff at a cost of three and one-half per cent interest and of a lien on its property when it might have avoided both liabilities by its deposit or investment in bonds. The intelligent retention of it in such circumstances imports an intention to pursue profit. Any use whatever is an effort to achieve it.

What the Commissioner obviously intended when he held that the plaintiff had not leased its property under a long term lease at a fixed rental was that considering the terms and conditions of the lease and the method and means of collecting the rent plaintiff could not be deemed so inactive as to merit exemption and we agree with him. The history of this plaintiff shows that while it once had title to another property the substantial purpose of its existence and operation was the ownership of the leased theatre property. During the tax year and preceding years plaintiff was doing precisely what it was organized to do. Plaintiff's certificate gives it no power to operate a theatre nor to produce, or em-

ploy anyone to perform in entertainments of any kind. It leased the theatre before building started and never since could do anything but lease it. In Edwards v. Chile Copper Co., supra [270 U.S. 452, 46 S.Ct. 346], the Court said that the appellee there "was organized for profit and was doing what it principally was organized to do in order to realize profit."

To sustain its claim of error in the Commissioner's assignment of want of a fixed rent as ground for his decision plaintiff relies on three cases. In Harrisburg Hotel Co. v. United States, 3 Cir., 145 F.2d 116 and D.C., 51 F.Supp. 436, both Circuit and District Courts exempted the plaintiff from taxation, where the rental under the lease was established by a graduated percentage of the receipts, a fact that was casually accepted. In 1426 Woodward Avenue Corp. v. United States, D.C., 69 F.Supp. 270, where a similar rental was involved, the Court observed that the Treasury Regulations did not explicitly require a flat rent or otherwise qualify the rent. In affirming Mahoning Coal R. Co. v. Higgins, 2 Cir., 145 F.2d 694, on Judge Leibell's opinion at 57 F.Supp. 717, our Circuit Court approved the exemption of a landlord largely owned by the tenant which paid a rent calculated on a percentage of earnings with a guaranteed minimum. There the point raised by the Government seems to have been that the lease made the parties joint adventurers in the tenant's operations. The railroad cases are practically irrelevant here anyway. There is no similarity in the position of a corporate lessor of an urban structure and that of the landlord companies in the railroad cases where the lease, always long, is of a right of way, unchangeable in its nature, to a franchise holder whose advantageous operation of a carrier business thereon is secured by state regulation. Our Circuit Court must have thought so for in Hirsch Improvement Co. v. Commissioner, 2 Cir., 143 F.2d 912, it had taxed the owner whose situation was much like plaintiff's where one of its leases provided a percentage of sales rent. In the Harrisburg Hotel and Woodward Avenue cases the stock ownerships of landlord and lessee were such that there was no business reason for the land-

lord's own attention to its property. But here plaintiff, in order to determine the rent to which it was entitled, had to list the rents and keep informed of the terms of subleases and the character of subleases, to watch the form of entertainment offered, to strike a tentative account quarterly, and in the case of the taxable year where more than the guaranteed minimum was paid, to credit the excess over the guaranteed minimum on the amount coming due in the next quarter and it was at all times exercising its right to determine not to examine the books of the tenant and its manner of casting its report and determining its items of income. It was at all times exercising its discretion as to the wisdom of examining the building and its appurtenances to protect its reversion in well conditioned personal property and weighing its confidence in the tenant against the necessity of such an examination. In doing all these things or in exercising its power not to do them, we think this plaintiff was doing business. There seems to be a substantial difference between the passive receipt of a fixed sum and the active collection of an amount that requires computation, consideration, examination and decision accompanied by the considered exercise or waiver of the right to investigate and dispute. Section Seven Corp. v. Anglim, 9 Cir., 136 F.2d 155; Detroit Hotel Co. v. Brady, D.C., 275 F. 995; Hirsch Improvement Co. v. Commissioner, 2 Cir., 143 F.2d 912; Mitchell v. Clark Iron Co., 220 U.S. 107 at page 170, 31 S. Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312. Certainly these things were done or omitted only to secure payment of what rent was due to the plaintiff. But we find no case that says that only such operations of a corporation as produce new sources of profit constitute doing business. In Von Baumbach v. Sargent Land Co., 242 U.S. 503, 37 S.Ct. 201, 61 L.Ed. 460, the Court said that a corporation that is maintaining its organization for the purpose of continued efforts in the pursuit of gain was doing business. Article 43(b) 1, supra, incorporates this language.

The length of the lease is determinable upon failure to observe a number of covenants. Indeed the termination, dispossess and reletting clauses—the usual ones found in leases of business buildings—manifest that this plaintiff, when the lease was made, contemplated the many vicissitudes that lawyers habitually envisage as real possibilities when letting real estate to the most reliable tenants; fire, condemnation, assignments, subleases and whatnot. Plaintiff fortified itself as well as foresight could devise against those expectable changes. It did not feel secure for a long term of quiet but expressed its intention to exercise continued vigilance.

A necessary condition of any exemption is the distribution of the avails of the lease of the taxpayer's property and the Commissioner found that this plaintiff failed to so disburse its income. During the taxable year and the prior two years, this corporation distributed its own notes. These may be looked upon as promises of a future distribution but they were not a then present distribution of profit. We are on notice that the two earlier notes were not paid but carried interest during the tax year. Its own accountant carried all as general liabilities in his balance sheet for the end of the tax year as he had to. When taxes, interest and amortization and the operating expense of plaintiff were deducted from its income for the tax year, $25,000, remained. This item is set down as a disbursement in Exhibit 8, described though as an increase in amounts receivable; the finance corporation had it. The evidence that the income of this inexpensively operated plaintiff when its taxes, interest and amortization had been paid was so far beyond its control that it executed and delivered to its stockholder notes, some of them unpaid after two years, whose only purpose apparently is to mask its surplus is incontrovertible proof that the finance corporation was a borrower and not a bank and that plaintiff was conducting a business.

The Commissioner's reference to plaintiff's failure to disburse its net income intimates his disapproval of plaintiff's construction of its considerable surplus. We agree but regard development of this point unnecessary.

456

On each and all of the grounds that we have stated we sustain the Commissioner on all of his findings and hold plaintiff taxable under the Act.